# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL ACTION NO. 5:07CV3

| | | |
|---|---|---|
| CAROLYN BRADLEY, | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Memorandum and Order** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| **Commissioner, Social Security Administration,** | ) | |
| **Defendant.** | ) | |
| ———————————————————— | ) | |

**THIS MATTER** is before the Court on cross-motions for summary judgment. (Documents ##10-14)

Pursuant to 28 U.S.C. § 636(b)(1)(B) and the undersigned's standing order of reference, this Court referred the aforesaid motion to United States Magistrate Judge David Keesler for recommended disposition. In an opinion filed on August 23, 2007, the Magistrate Judge recommended that the Defendant's (hereinafter the "Commissioner") motion be granted and the decision of the Commissioner be affirmed. (M & R at 1,9.) Plaintiff's counsel filed Objections to the "Memorandum & Recommendation" of the Magistrate Judge on September 9, 2007. (Document #16) Plaintiff, acting *pro se*, submitted additional materials directly to chambers for the Court's consideration.[1] Plaintiff's objections are deemed to be timely and the specific objections raised by

---

[1] Most of the materials submitted by Plaintiff, some of which are sensitive, are already of record: November 11, 2002 Psychological Evaluation from Carolina Psych Group, P.A.; a typed time line of Plaintiff's administrative proceedings between October 24, 1994 and November 12, 2002; correspondence from Dr. Daniel Bellingham of Piedmont HealthCare dated September 13, 2002; correspondence from Dr. Duncan A. McCall of Piedmont HealthCare, Department of Rheumatology, dated October 3, 2001; medical records prepared by Dr. McCall dated August 5, 2002; lab report from SmithKline Bio-Science Laboratories dated March 3, 1989; medical records prepared by Dr. Harry G. Walker of Iredell Memorial Hospital dated February 23, 1989 and related discharge summary dated March 3, 1989; medical report

Plaintiff are considered herein. The Commissioner elected not to submit a reply brief. (Document #17)

## I. MARCH 1, 2006 DECISION OF THE ADMINISTRATIVE LAW JUDGE[2]

The question before the ALJ with regard to Plaintiff's second application for disability benefits was whether at any time after January 15, 1991 (the alleged disability onset date) and before September 30, 1994 (the date Plaintiff last met insured status), Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[3] The ALJ considered the evidence and concluded in his written opinion that Plaintiff suffers from spondylolysis, early degeneration, arthralgias,

---

prepared by Dr. Patricia K. Hill of Davis Community Hospital in Statesville, NC, dated March 4, 1989 (addressing mental impairment / subsequent to psychotic episode possibly triggered by medication); correspondence from Dr. James M. Currin, Jr., of Laurinburg Family Practice in Laurinburg, NC, to Dr. Vann Austin of Pinehurst Medical Clinic, dated August 25, 1981 (lower lumbar back pain); incomplete medical records from Davis Hospital, Inc., in Statesville, NC, dated June 17, 1986 (low back pain with multiple joint pain); correspondence from Jewell S. Mabery MSN G-ANP, C of Piedmont Health Care dated October 22, 2001 (treatment of fibromyalgia and arthralgia complicated due to severe anaphylactic reactions to medications ordinarily used for treatment – i.e., steroids, inflammatory drugs, muscle relaxants); radiology report dated March 30, 1998 ordered by Dr. Richard M. Pavelock (neck pain and numbness resulting from auto accident); medical records from Scotland Memorial Hospital in Laurinburg, NC, from 1981 (back pain); copy of a Social Security Administration Discrimination Complaint dated September 26, 2005, and alleging discrimination against Plaintiff by Social Security Administration based upon disability, age, and retaliation. In addition, Plaintiff submitted copies of several forms and other materials (*e.g.*, Request For Review Of Hearing Decision / Order, Exhibit 22 VER dated October 22, 1994 / miscellaneous correspondence, etc.) already made part of the administrative record.

[2] Plaintiff applied for disability benefits on two separate occasions. As explained in more detail within the Magistrate Judge's M & R, during the second phase of proceedings, Plaintiff's case was voluntarily remanded from this federal district court to the Commissioner. The March 1, 2006 decision of the Commissioner is now at issue.

[3] Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ....

Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

2

personality disorder, and high borderline intellect. (R. at 524.) While these impairments were "severe" within the regulatory meaning, the ALJ found that no impairment or combination of impairments was severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 526.)

The ALJ found that Plaintiff had the residual functional capacity to perform "light work," including the ability to do sedentary work, which requires lifting no more than fifteen pounds occasionally or ten pounds regularly, stand for six hours, sit for six hours (with an opportunity to stand every 30 -40 minutes), with no repetitive stooping, bending, and no more than simple, routine, repetitive duties. (R. at 526.) In addition, the ALJ determined that Plaintiff should have no public contact or more than occasional interaction with co-workers. (R. at 526.) The ALJ found that Plaintiff was closely approaching advanced age on the date last insured (age 45). (R. at 528.) Plaintiff's limited education was noted as well as the concern that Plaintiff may be considered illiterate even though she is able to communicate in English. (R. at 528.) Contrary to the ALJ's April 22, 2004 decision, the ALJ assigned the case on remand concluded that Plaintiff would be unable to return to any of her previous employments. (R. at 528.) Additionally, based upon her residual functional capacity, and the testimony of a Vocational Expert ("VE"), the ALJ found that Plaintiff could have performed work which existed in significant numbers in the national economy, namely, Cleaner and Bagger (garment) positions, both classified by a vocational expert as "light and unskilled work." (R. at 529, 698.) Accordingly, the ALJ concluded once again that Plaintiff was not disabled as defined for Social Security purposes.

## II.  REVIEW OF MAGISTRATE JUDGE'S RECOMMENDATION

The Federal Magistrate Act provides that "a district court shall make a *de novo* determination

of those portions of the report or specific proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983); Keeler v. Pea, 782 F.Supp. 42, 43 (D.S.C. 1992). *De novo* review is not required by the statute when an objecting party makes only general or conclusory objections that do not direct the court to the specific error in the magistrate judge's recommendations. Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir.1982). Further, the statute does not on its face require any review at all of issues that are not the subject of an objection. Thomas v. Arn, 474 U.S. 140, 149 (1985); Camby, 718 F.2d at 200. Nonetheless, a district judge is responsible for the final determination and outcome of the case, and accordingly the Court has conducted a careful review of the Magistrate Judge's "Memorandum & Recommendation" as well as a *de novo* review of those issues specifically raised in Plaintiff's objections.

## III. REVIEW OF COMMISSIONER'S DECISION

The Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); *see also* Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (*per curiam*). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), the Fourth Circuit defined "substantial evidence" as

> being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Id. (*quoting* Perales, 402 U.S. at 401).

The reviewing court is not permitted to re-weigh the evidence or substitute its judgment for that of the Commissioner – so long as that decision is supported by substantial evidence. Hays, 907

F.2d at 1456; *see also* <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986); <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the Commissioner, not the courts, to make findings of fact and to resolve conflicts in the evidence. <u>Hays</u>, 907 F.2d at 1456; <u>King v. Califano</u>, 599 F.2d 597, 599 (4th Cir. 1979) ("This court does not find facts or try the case *de novo* when reviewing disability determinations."); <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistences in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion.") Indeed, so long as the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court disagrees with the final outcome. <u>Lester v. Schweiker</u>, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. FACTUAL & PROCEDURAL BACKGROUND

Neither party filed specific objections challenging the factual findings of the Magistrate Judge. Therefore, the Court adopts the facts and procedural history as set forth by the Magistrate Judge and hereby incorporates them by reference. (M & R at 1-6.)

## V. DISCUSSION

As an initial matter, the Court reiterates that the relevant time period for purposes of this Court's review is between January 15, 1991 (the alleged disability onset date) and September 30, 1994 (the date Plaintiff last met the insured status requirement of the Social Security Act). It is Plaintiff's burden to establish disability. *See* <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir.1976) (claimant bears the risk of nonpersuasion).

### A. STEP 3 - Combination Of Impairments & Listings

In addition to the physical or exertional severe impairments, the ALJ deemed Plaintiff's

personality disorder and high borderline intellect severe. (R: 525) While the Plaintiff did not specifically object to the Commissioner's findings at stage three of the prescribed analysis, in light of the record, the undersigned carefully considers whether Plaintiff's mental impairments have been properly addressed. *See* <u>Bennett v. Bowen</u>, 884 F.2d 1387, 1989 WL 100665, *3 (4th Cir.1989) (finding it appropriate to review the ALJ's decision in its entirety despite single issue that triggered remand to Commissioner).

Plaintiff Bradley's first mental health evaluation of record occurred at age 19 pursuant to an involuntary commitment to Dorthea Dix Hospital in 1965 after an attempted suicide. (R: 459-60) Plaintiff's diagnosis was "Passive agressive personality, passive aggressive type." (R: 460) Upon discharge, it was recommended that Plaintiff seek outpatient psychotherapy. (R: 460)

Plaintiff was admitted to Dorthea Dix a second time in May 1966 for another apparent suicide gesture after taking "an overdose of nerve pills." (R: 464) Records indicate that Plaintiff: had "a great deal of denial and hostility" and that she "did very little in terms of understanding herself while in the hospital." (R: 465) "[N]o real insight was obtained" by Plaintiff and "sessions of scheduled psycho-therapy proved fruitless." (R: 465) Clinical notes state that Plaintiff's "mal-adapted personality traits will be a source of concern for years to come, probably." (R: 466) Upon discharge, it was recommended that Plaintiff follow up in the hospital's Outpatient Clinic and participate in psychotherapy. (R: 465)

The next record regarding Plaintiff's mental impairment is a Psychological Evaluation Report prepared by David T. Robinson, ED.D., dated November 2, 1986.[4] (R: 233-36) The evaluation was

---

[4] There is a nearly twenty-year "gap" in the documentation of mental health services between 1966 and 1986.

sought for purposes of developing a work rehabilitation program. (R: 233) Testing indicated a "borderline defective range of intelligence." (R: 234) The 1986 Wechsler Adult Intelligence Scale scores were: Verbal IQ: 75; Performance IQ: 79; and Full Scale IQ: 76. (R: 234) Plaintiff's functional illiteracy is also documented. (R: 234-35) An Adult Basic Education Program was suggested with an emphasis on "lower grade level work." (R: 234) The evaluator noted that despite Plaintiff's level of ability, her level of motivation was "good." (R: 233) A diagnosis of Mixed Personality Disorder (DSM III, 301.89) was given with dominant features identified as: "the presence of anxiety, depression, lowered self esteem, tendency to manipulate others, and impulsive behavior." (R: 235)

Plaintiff was admitted to Davis Community Hospital in Statesville, North Carolina, for another psychiatric intervention on August 19, 1988.[5] (R: 241-250) Upon admission, Plaintiff's primary complaints were symptoms of depression and anxiety for feelings of loss of control. (R: 242) "Major depression, recurrent" was noted. (R: 244) "Rule out bipolar affective disorder" and "severe family stress" were also noted as impressions. (R: 244) The treatment plan included voluntary inpatient hospitalization for further observation, patient safety, and evaluation along with medication titration and individual and group psychotherapy. (R: 244) On August 25, 1988, Plaintiff left against medical advice. (R: 246) According to the discharge summary prepared by Dr. Patricia K. Hill, it was recommended that Plaintiff follow-up with outpatient mental health providers as needed for individual and marital counseling. (R: 245, 247) No medications were prescribed at discharge. (R.

---

[5] The "Past History" section of the Davis Community records indicate Plaintiff had a previous sixty-day hospitalization and a hospitalization at age 17. (R: 241) Similarly, there is mention of a hospitalization at age 18 for an overactive thyroid as well. (R: 140.) However, these records do not appear to be available as part of Plaintiff's social security file.

at 247)  The discharge summary also reveals Plaintiff experienced "great difficulty" adjusting to the hospitalization and particularly in getting along with others on the unit.  (R: 242)  Dr. Hill's final diagnosis reads as follows:

> "Still difficult to determine but at this point is major depression, recurrent versus adjustment disorder with mixed emotional symptoms versus bipolar affective disorder-mixed.  Patient also had strong histrionic traits if not histrionic personality disorder and also had a history of seizure disorder."[6]

(R: 247)  Dr. Hill's characterization of Plaintiff's traits as "strong histrionic traits" indicates Plaintiff tended to be excessively dramatic or emotional.

Plaintiff was seen at Davis Community Hospital again on  March 4, 1989.  The records submitted by Plaintiff, which are incomplete, reveal that Plaintiff went for treatment at Davis Community shortly after being discharged from Iredell Memorial Hospital, where Plaintiff was apparently placed on a steroid for symptoms related to TMJ arthritis and / or ear or sinus infection.[7] Davis Community records note that the steroid prescribed by Iredell Memorial may have caused Plaintiff to become "psychotic."  Plaintiff reported to hospital personnel that she had not been following the advice or recommendations of her mental health providers.[8]

---

[6] The administrative record appears inadvertently to separate Dr. Hill's three-page discharge summary.  Page three of the summary (found at R: 247) should immediately follow page two (found at R: 243).

[7] Plaintiff received treatment at Iredell Memorial Hospital between February 23, 1989 and March 3, 1989 for Bronchopneumonia, vomiting and dehydration.  (R: 133-34)

[8]  Following the original diagnosis of personality disorder in 1965, Plaintiff was able to perform substantial gainful activity through the alleged date of onset in 1991.  As counsel argued to the ALJ, however, Plaintiff's employment history was sporadic and generally consisted of unskilled work.  Plaintiff generated only a minimal amount of income.

In June 1994, another psychological evaluation was undertaken in connection with vocational rehabilitation efforts.[9]  (R: 137-44)  Marsha Alexander, M.A., LPA ("Alexander"), administered the testing.  On the WAIS-R, Plaintiff's scores were slightly higher than in years past: Verbal IQ - 80; Performance IQ - 84; and Full Scale IQ - 82.  (R: 140-41)  Plaintiff's DSM III-R diagnoses included Borderline Intelligence, DSM III-R V40.00, Developmental Reading Disorder, DSM III-R 315.00, Developmental Arithmetic Disorder, DSM III-R 315.10, Developmental Language Disorder, DSM III-R 315.31, and Borderline Personality Disorder, DSM III-R 301.83.  (R: 142)

Alexander opined that "[i]ntellectually, Carolyn has the ability to work in many fields.  She is strongest in use of common sense skills and will probably be most successful in areas where she can have hands-on, manual training rather than academic training."  (R: 142)  One of Plaintiff's strengths was identified as her "practical response to social situations."  (R: 141)  Plaintiff's specific weaknesses were identified as "all measures below average, especially general information and logical reasoning and thinking."  (R: 142)  The examiner noted Plaintiff was "actively cooperative," and "worked well on all tasks, trying her best and not giving up easily."  (R: 140)

Relevant to Plaintiff's personality disorder, Alexander noted Plaintiff's results on the Bender-Gestalt Test revealed "strong narcissism with anxiety and predictable behavior" as well as "strong hostile, agressive behavior."  (R: 141)  Results of the Thematic Apperception Test indicated Plaintiff was "angry, rebellious, and depressed."  (R: 141)  Alexander further commented on Plaintiff's "negative, oppositional tendencies with hostilities toward males" and her "evasiveness with minimum cooperation."  (R: 141)  Alexander noted Plaintiff was   "suspicious  with  other  paranoid

_____

[9] More than any other, this particular evaluation, which was for the purpose of assisting Plaintiff to determine appropriate employment, is hard to make sense of because the various findings seem contradictory.

characteristics." (R: 141)

Another psychological evaluation was performed by Susan A. Frank, MA, LPA ("Frank") and James A. Powell, Psy. D. ("Powell") in November 2002. (R: 261-64) Plaintiff referred herself for purposes of pursuing her application for disability benefits. (R: 261) Psychiatric history was noted and Plaintiff reported that she had been "in therapy and counseling on and off throughout her life time." (R: 261) Frank observed that Plaintiff was oriented to time, place, and person; disorganized in giving information; pleasant and cooperative in all tasks presented to her; and seemed to try to the best of her abilities. (R: 262) Plaintiff experienced difficulty when instructions were given or information was given verbally. (R: 262) The examiner observed Plaintiff repeat the instructions aloud. (R: 262) Test results on the WAIS-III were**:** Verbal IQ: 79; Performance IQ: 78; and Full Scale IQ: 77. (R: 263) Plaintiff's performance on the Woodcock-Johnson Achievement Test, when compared with others at her age level, placed Plaintiff within the "Very Low" range. (R: 263-64) Plaintiff was considered as functioning within the Borderline range of mental handicap. (R: 264) It was noted that Plaintiff presented with good social skills and enjoyed interacting with others. (R: 264) Plaintiff's Visual perception and fine-motor skill problems were noted and deemed suggestive of neurological problems. (R: 264) Plaintiff's past efforts to seek academic remediation training were noted as unsuccessful. (R: 264) Plaintiff's difficulties with depression were noted as a possible future complication. (R: 264) Plaintiff's consistency and endurance were also questionable. (R: 264)

### i. The ALJ Considered Whether Plaintiff's Severe Impairments Might Meet Or Medically Equal The Affective Disorder Listing

In considering at step three whether Plaintiff had an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I, the ALJ specifically considered the Mental Listings §12.04 - Affective Disorders, which involves a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."[10] (R: 526)  The ALJ found the following mental limitations under the "B" criteria as:

---

[10]  Affective Disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."
Under Section 12.04, the required level of severity is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied. (C is not relevant here.)

A.  Medically documented persistence, either continuous or intermittent, of one of the following:
1.  Depressive syndrome characterized by at least four of the following:
    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f.  Feelings of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or
    h.  Thoughts of suicide; or
    i.  Hallucinations, delusions or paranoid thinking; or

2.  Manic syndrome characterized by at least three of the following:
    a.  Hyperactivity; or
    b.  Pressure of speech; or
    c.  Flight of ideas; or
    d. Inflated self-esteem; or
    e.  Decreased need for sleep; or
    f.  Easy distractibility; or
    g. Involvement in activities that have a high probability of painful consequnces which are not recognized; or
    h.  Hallucinations, delusions or paranoid thinking;
Or

3.  Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B.  Resulting in at least two of the following:
1.  Marked restriction of activities of daily living; or

"mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace." (R: 526)  The ALJ noted the lack of evidence that Plaintiff experienced episodes of decompensation during the relevant time period. (R: 526)

With respect to Plaintiff's psychological impairment, the ALJ noted: a "longstanding history of treatment for depressive symptoms with some inpatient psychiatric care years ago." (R.: 525.) The ALJ stated that Plaintiff was "not shown to be significantly troubled by depression or other disorder during the 1991 - 1994 period, although life-long personality features were apparent." (R.: 525) The ALJ cited to the June 28, 1994 Vocational Expert Report ("VER") indicating that Plaintiff was "alert, calm and friendly." (R: 140)  The same VER, *supra*, describes Plaintiff's narcissistic traits and other barriers Plaintiff may face in attempting to engage in substantial gainful activity. (R: 141-42)

The ALJ did not include depression as one of Plaintiff's severe impairments, explaining the absence of "clinical signs or findings to substantiate that this condition caused more than a limited ability to perform basic work-related activity by September 30, 1994." (R: 525-26)  The ALJ noted Plaintiff's earlier significant psychological history (*e.g.*, multiple inpatient hospitalizations). (R: 527)

Finally, the ALJ noted that Plaintiff did not require ongoing care by a mental health professional during the 1990's.[11] (R: 527-28)

---

2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

[11] However, the fact that Plaintiff did not seek out or obtain mental health treatment on a regular basis during the 1990's does not mean that Plaintiff did not need or require it.  In a 1994 VER, Plaintiff reportedly advised that she sought group therapy from the Counseling Center of Iredell, was told that she would not benefit from group therapy, that she should pursue individual therapy instead, but that Plaintiff

**ii.  The ALJ Did Not Consider The Personality Disorder Listing As A  Possible Basis For Finding Disability**

The most recent ALJ to consider Plaintiff's claim did not consider the Listing for Personality Disorder (§12.08) [or Mental Retardation (§12.05(C))].  (*See* Section "III,A,iv" *infra*) With respect to personality disorder, federal regulations explain:

> A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.  Characteristic features are typical of the individual's ***long-term functioning*** and are not limited to discrete episodes of illness.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

> A.  Deeply ingrained, maladaptive patterns of behavior associated with **<u>one</u>** of the following:
> 1.  Seclusivensss or autistic thinking; or
> 2.  Pathologically inappropriate suspiciousness or hostility; or
> 3.  Oddities of thought, perception, speech and behavior; or
> 4.  Persistent disturbances of mood or affect; or
> 5.  Pathological dependence, passivity, or aggressivity; or
> 6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

> And

> B.  Resulting in at least **<u>two</u>** of the following:
> 1.  Marked restriction of activities of daily living; or
> 2.  Marked difficulties in maintaining social functioning; or
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.08 (*emphases provided*).  Since the ALJ determined that Plaintiff's restrictions and difficulties  were ***mild to moderate*** rather than "marked"  in connection

---

was unable to afford individual therapy.  (R: 152) There is additional support within the record indicating Plaintiff's historical non-compliance with recommended treatment.

with its §12.04 findings (*i.e.*, "mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace"), the ALJ likely would have determined that Plaintiff did not satisfy this listing either. (*See* Section "V, A, ii")

### iii. Implementation of 20 C.F.R. §404.1520a

Following the March 1, 2006 ALJ decision, a regulation prescribing a new technique for evaluating mental impairments was promulgated and became effective August 1, 2006. *See* 20 C.F.R. §404.1520a. The new regulation calls for implementation of a "special technique" at each level of the administrative review process that 1) evaluates symptoms, signs, and laboratory findings to determine the existence of any medically determinable mental impairment; 2) specifies the symptoms, signs, and laboratory findings that substantiate the presence of the impairment; and 3) rates the degree of functional limitation for each impairment. *See* 20 C.F.R. §404.1520a(b). All of the Commissioner's findings at each level of the review process, including the initial and reconsideration levels, must be appropriately documented. *See* 20 C.F.R. §404.1520a(e).

Pursuant to §404.1520a, the evaluation process for mental impairment requires the Commissioner to rate the degree of functional limitation associated with any medically determinable mental impairment. *See* 20 C.F.R. §404.1520a(c). The rating of functional limitations associated with mental impairment is then used to evaluate severity. Subsection (c) of §404.1520a reads:

> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis.  Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function.  See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3)  We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or  pace; and episodes of decompensation.  See 12.00C of the Listing of Impairments.

(4)  When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale:  None, one or two, three, four or more.  The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

For purposes of step three, with any severe mental impairment, the rating of the degree of functional limitation is then compared to the relevant Listing criteria. *See* 20 C.F.R. §404.1520a(d)(2).

As revised, Section 404.1520a also expressly requires that at the initial and reconsideration levels . . . the agency's [Social Security Administration's] consulting "medical or psychological expert (as defined in §405.5 of this chapter) ha[ve] overall responsibility for assessing medical severity."[12]

---

[12] A "medical expert" is defined in §405.5 of this chapter as: "a medical professional who has the qualifications required by the Commissioner and who provides expertise to disability adjudicators at the initial, Federal reviewing official, and administrative law judge levels of the administrative review process." 20 C.F.R. §404.5.  A "psychological expert" as defined by §405.5  is "a psychological professional" who satisfies the same definitional criteria.  Id.

"Federal reviewing official" refers to "a Federal official who reviews the initial determination." 20 C.F.R. §404.5.  "Initial determination" means the determination by the State agency.  Id.  "State agency" means "the agency of a State that has been designated by the State to carry out the disability determination function.  It also means the Federal disability determination services and agencies that carry out the

20 C.F.R. §404.1520a(e)(1). This change in procedure appears to be due in part to the Commissioner's recognition that evaluation of mental impairment and the rating of any related functional limitations is no easy task and is, therefore, better left to the experts.

Finally, under §404.1520a(e), the ALJ's written decision **must** incorporate the pertinent findings and conclusions based upon the prescribed technique, such as:

> (1) the significant history, including examination and laboratory findings,
> (2) the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s); and
> (3) a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c).

See 20 C.F.R. §404.1520a(e)(2).

Even though this rating technique was not in effect when the Commissioner last considered Plaintiff's application for disability benefits, much of what is contemplated by the new regulation was, in fact, considered by the Commissioner in its March 2006 decision.[13] (R: 526) For instance, Plaintiff's functional limitations were classified **by the ALJ** as mild and moderate, some mental impairments were designated severe and others were not, etc. (R: 526) Because the ALJ assessed the severity of Plaintiff's functional limitations rather than a consulting medical or psychological expert, remand is appropriate on this issue.

---

disability determination function in Puerto Rico, Guam, and the District of Columbia." Id.

[13] Plaintiff's case was last reviewed in accordance with the regulations for evaluating mental impairments, effective September 20, 2000. In fact, Plaintiff's case was remanded to the ALJ from the Appeals Council for that very purpose because the ALJ's prior decision did not evaluate her mental impairments under the September 2000 revised criteria. (M & R at 2.)

Even the ALJ who decided Plaintiff's October 1994 claim for disability benefits, who did not consider Plaintiff's mental impairments "severe," nevertheless attempted to rate each alleged functional limitation. (R: 276-77)

### iv. Relation Back of Subsequent Objective Medical Evidence

Because much of the administrative record includes materials relating to different time periods, and because there is objective medical evidence supporting the personality disorder diagnosis both before and after the relevant 1991 to 1994 time period, the undersigned also wonders whether the post-1994 records could be related back for purposes of the instant disability determination and review. *See* Bennett v. Bowen, 884 F.2d 1387, 1989 WL 100665 (4th Cir.1989) (*unpublished*) (affirming denial of benefits where claimant suffered from multiple severe physical and mental impairments, including borderline intellect and personality disorder, but was deemed capable of performing unskilled light and sedentary work). Significantly, the Fourth Circuit noted in Bennett that ***absent evidence indicating that doing so was supported by the evidence***, the diagnoses within subsequent evaluations and testing (two years after claimant's eligibility expired) and submitted by claimant on remand could not automatically be projected back for purposes of the step three analysis for the relevant time period. *See* Bennett, 1989 WL 100665, *3. The Fourth Circuit ultimately upheld the Commissioner's denial of benefits, finding that the ALJ adequately considered the effects of claimant's borderline retardation in determining the types of jobs claimant could still perform. Id. *4. Despite the ultimate disposition in Bennett, the Fourth Circuit recognized the possibility of relying on objective medical evidence obtained outside of the relevant time period.

Relevant to her severe physical impairments, the ALJ mentioned the existence of materials presented by Plaintiff that fell outside of the 1991 to 1994 time period - Drs. Wodecki and Pavelock, both of whom treated Plaintiff in the late nineties. (R: 526)    With respect to mental impairment, according to the Commissioner, "the record does not suggest that [Plaintiff] was seriously troubled by depression or anxiety during the [1991 - 1994] period, despite an earlier significant history." (R:

527)  The ALJ did not address relation back of the 2002 Psychological Evaluation that diagnosed Plaintiff with mental impairments even though these findings are consistent with the objective medical evidence within the record from prior to 1991.  (R: 527)  Indeed, the Section 12.08 Listing for Personality Disorder describes how personality disorder is typically seen via evaluation of an individual's **long-term functioning**.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.08.  Referring to the 2002 psychological report, Plaintiff's counsel explained:

> I'm not arguing here whether, you know, it falls in or out of the time period.  But I think it does a really good job of documenting some characteristics that are, you know, have been of long standing[sic] and comport with the very early records that we have from Dorthea Dicks[sic "Dix Hospital"].  We start to see a pattern of behavior if you look at the Dorthea Dicks[sic] records.  If you look at the records from Davis Hospital after about 10 or 15 years old, or maybe 20 years old now, and then if you look at the psychological battery that was done at Carolina Psych Group I think you see some, you know, some trends that are stable throughout adulthood.

(R: 53)  After a review of the entire record, and notwithstanding Plaintiff's evidentiary burden, it appears the Commissioner determined somehow that Plaintiff's mental illness lay dormant during the relevant time period.  Because it is not clear exactly why the Commissioner did not find relation back of subsequent materials proper, this issue should also be addressed by the Commissioner on remand.

### v.  Plaintiff Does Not Automatically Satisfy The Section 12.05(C) Disability Listing Despite The Commissioner's Decision That Plaintiff Was Of Borderline Intellect And Could Not Return To Her Past Relevant Work

Notwithstanding a general objection to the ALJ's RFC analysis, discussed, *infra*, Plaintiff also seems to argue that her combination of borderline intellect and other exertional and non-exertional limitations satisfy the listing at §12.05(C) because she was, in fact, unable to return to past relevant

work — an objection to the third step or stage three in the sequential evaluation process.[14]  *See e.g.,* Flowers v. U.S. Dep't of Health & Human Servs., 904 F.2d 211, 214 (4th Cir.1990)("In this circuit, we follow the rule that if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of §12.05(C).") (*citing* Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir.1985)).   Notwithstanding her inability to return to her past relevant work,  Plaintiff does not satisfy the first criteria under §12.05(C).

The Section 12.05 Listing generally applies to claims for disability based upon mental retardation.  *See* Young v. Bowen, 858 F.2d 951, (4th Cir.1988).  "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22."   20 C.F.R. Pt.404, Subpt. P, App. 1, 12.05.   Id.  The Section 12.05 Listing provides for a continuum of disability findings based upon mental retardation. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, §12.05(A) - (D) .   Accordingly, "[t]he required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied."   Id.   Section 12.05(C) provides for a finding of disability when the claimant demonstrates:

> "A valid verbal, performance, or full IQ of 60 through 70 [or 60 to 69 inclusive] **and** a physical or other mental impairment imposing additional and significant work-related limitations of function."

20 C.F.R. Pt. 404, Subpart P, App. 1, §12.05(C); *See* Wilbon v. Comm'r of Social Security, 181 Fed. Appx. 826, 2006 WL 1374476 (11th Cir.2006) (*unpublished*) (denial of benefits upheld under 12.05(C) where claimant's IQ score was within the 60 to 70 range but no additional impairment

---

[14] Plaintiff cited Alderman v. Chater  in her exceptions / objections amidst the 2004 administrative proceedings.  (R: 499)  *See* Alderman v. Chater, 40 F.Supp.2d 367 (N.D.W.Va. Sept. 23, 1998).

found).

Here, Plaintiff is correct that the March 1, 2006 determination that the combination of her impairments precluded her return to her past relevant work is sufficient to satisfy the second criteria under §12.05(C). *See* Turner v. Bowen, 856 F.2d 695, 699 n. 9 (4th Cir.1988) (significant limitation under §12.05(C) need not be disabling in and of itself). Nonetheless, Plaintiff does not satisfy the initial prong of the 12.05(C) listing because her lowest IQ score does not fall within the 60 to 70 range. *See* Bennett, 1989 WL 100665, *4 (*unpublished*) (rejecting margin of error argument under §12.05 – circuit precedent does not support proposition that "close counts in horseshoes" as well as the Listings); Hazel v. Chater, 112 F.3d 509, 1997 WL 218839, *2 (4th Cir.1997) (*unpublished*) (IQ of 71 does not meet the criteria of Listing §12.05(C)); Cockerham v. Sullivan, 895 F.2d 492, 495 (8th Cir.1990) (claimant's IQ score of 71 could not be liberally construed to meet the requirements in Listing 12.05(C)); Dover v. Apfel, 203 F.3d 834, 2000 WL 135170, *2 (10th Cir.2000) (*same; listing cases*); *but see* Alderman v. Chater, 40 F.Supp.2d 367, 370-72 (N.D.W.Va. Sept. 23, 1998).[15] For this reason, Plaintiff does not meet the 12.05(C) disability criteria. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, §12.05(C).

_____

[15] In Alderman, the district court reversed the Commissioner's denial of benefits finding that the combined effect of multiple impairments, which rendered claimant unable to return to his past relevant work, satisfied the requirement of a work-related limitation of function under Section 12.05(C). *See* Alderman v. Chater, 40 F.Supp.2d 367, 370-72 (N.D.W.Va. Sept. 23, 1998). Like Plaintiff Bradley, the claimant in Alderman fell within the borderline range of intelligence but did not satisfy the §12.05(C) Listing based strictly on the suggested IQ range of 60 to 70. The court in Alderman pointed to application notes that the 60 through 70 range of scores was to be "used only for reference purposes" and that the required level of severity for mental retardation is measured instead by the standard prescribed in §12.05(C). Alderman, 40 F.Supp.2d at 370 (*emphasis in original*). The Alderman court misconstrued the §12.05(C) criteria by disregarding its conjunctive nature.

**B. STEP  5 --- Residual Functional Capacity**

The ALJ's findings regarding Plaintiff's Residual Functional Capacity ("RFC")[16], or Plaintiff's ability to perform other work in the national economy, are supported by the testimony of a vocational expert.  While the Court need not reach the fifth part of the sequential analysis given its determination that remand is appropriate for further evaluation at step three, the undersigned will nonetheless address Plaintiff's single specific objection to the magistrate judge's Memorandum and Recommendations.

**1.  The ALJ Evaluated Residual Functional Capacity Using the Correct Legal Standard**

In her appeal, Plaintiff argues that "the ALJ circumvented the legal requirement that the facts of the case be marshaled to support a conclusion."  (Pl's Obj. at 2-3.)   More specifically, Plaintiff contends that the ALJ failed "to provide a function-by-function assessment of [Ms. Bradley's] Residual Functional Capacity ("RFC") and a comparison of the RFC findings to the physical and mental requirements of plaintiff's past relevant work" as directed by this Court on remand.[17]  (Pl's Obj. at 2 (*citing* August 2, 2005 Order of Remand.))   However, as the Magistrate Judge notes, any flaws in the ALJ's analysis regarding past relevant work is rendered <u>moot</u> by the March 1, 2006 decision that Plaintiff was, in fact, unable to return to her past relevant work.  (M & R at 8.)

---

[16] Residual functional capacity simply refers to what the claimant ***can do*** despite claimant's mental and physical limitations.

[17] SSR 82-62 states:
> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact: (1) A finding of fact as to the individual's RFC.  (2) A finding of fact as to the physical and mental demands of the past job/occupation.  (3) A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

## 2. The Commissioner's Findings Regarding Plaintiff's Ability To Maintain Substantial Gainful Employment Is Not Supported By Substantial Evidence

At **step five**, the ALJ relied upon the testimony of a vocational expert and determined that between 1991 and 1994, Plaintiff was able to perform light, unskilled work. The specific examples of such work given by the vocational expert were "Cleaner" (laundry classifier) and "Bagger (garment)."[18] (R: 698) The vocational expert similarly identified a position classified as sedentary and unskilled - Patcher (final assembler of eyeglass frames). (R:700-01) The ALJ noted in his decision that these jobs do not require literacy and also allow the Plaintiff the option of sitting or standing. (R: 529) Assuming Plaintiff had the ability to retain the instructions, these occupations were described as "simple."[19] (R: 529)

In addition, one of the non-exertional limitations found by the ALJ was that "the claimant should have no public contact or more than occasional interaction with coworkers." (R: 526-27) Thus, it appears that the ALJ accounted to some extent for Plaintiff's mental impairments. *See* Brower v. Barnhart, 91 Fed. Appx. 518, 2004 WL 120502, * 1 (8th Cir. 2004) (*unpublished*) (ALJ

---

[18] The Dictionary of Occupational Titles ("DOT") describes "Cleaner" at #323.687-014, SVP 2, with 34,751 jobs in the state of North Carolina and 245,622 in the national economy. (R: 529) DOT describes "Bagger (garment)" at #920.687-018, SVP 1. (R: 529) *See generally,* DeLoatche v. Heckler, 715 F.2d 148, 151 (4th Cir. 1983) (ALJ may rely on the general job categories in the Dictionary of Occupational Titles).

[19] During the administrative hearing, there was a colloquy between Plaintiff's counsel and the ALJ regarding Plaintiff's ability to follow instructions in a work setting and a specific reference to Plaintiff's Exhibit 22, which is a Vocational Evaluation Report ("VER") dated October 18, 1994. The Court has reviewed Exhibit 22 in its entirety, as well as the other VERs found within the record. Within the various VERs is evidence that Plaintiff experienced difficulty with certain tests and related instructions, as well as evidence that Plaintiff did fine with certain other testing instructions. A VER from 1987 describes Plaintiff following oral directions with demonstration, but requiring multiple demonstrations and practice runs on at least one of several specific tests before completing the task. (R: 227-28) The 1987 VER identifies one of Plaintiff's limitations as "some difficulty following multi-stepped oral directions with demonstration." (R: 230)

adequately accounted for claimant's mental impairments by posing hypothetical questions to the vocational examiner regarding claimant's ability to perform identified jobs if claimant was socially isolated and had problems working with supervisors).

The Magistrate Judge noted that vocational expert testimony may provide "substantial evidence" for purposes of the final / fifth step of the requisite disability analysis. (M & R at 7.) *See* Wilson v. Califano, 617 F.2d 1050 (4th Cir.1980). However, in this case, the vocational expert's testimony was less than decisive and, therefore, does not satisfy the substantial evidence threshold. It is true that the vocational expert identified at least two "light and unskilled" jobs that Plaintiff might have been able to perform during the relevant time period. (R:698) The ALJ asked the vocational expert to assume credibility and that the limitations described by Plaintiff were supported by objective medical evidence in the record:

> **ALJ:** If I find that her testimony concerning her limitations is credible and there is medical evidence to support them in the record, do you have an opinion as to whether she could manage these jobs or could you find more appropriate jobs for such a person?

> **VOCATIONAL EXPERT:** Assuming that the testimony is credible, Your Honor, with the physical problems that have been mentioned, as well as emotional problems, in my opinion it would be ***very, very difficult*** for such an individual to maintain ***any job***.

(R: 701) (*emphases provided*).

In response to questions by Plaintiff's counsel regarding the Cleaner position, the VE testified that significant pain, like Plaintiff complained of experiencing when standing, sitting, etc., might slow down the process and impair the process for other workers. (R: 703) The VE also testified that despite the fact that the bagger job was very simple, if Plaintiff were able to demonstrate an inability to understand and retain simple instructions, it could "make it hard to maintain" the bagger job.

(R:704)

One example of Plaintiff's potential for difficulty in an employment setting – even obtaining employment – is demonstrated by her failed attempt to complete a sample application for employment during a vocational evaluation in 1987. (R: 229) Plaintiff didn't finish the sample application. (R: 229) She complained that the "print was so small," that she "couldn't read it." (R: 229) She questioned the need to transfer the information to the form application because she had all the information written down elsewhere.

### 3. Plaintiff's Credibility

The ALJ discredited Plaintiff's testimony on a few key points.[20] For example, the ALJ took issue with Plaintiff's assertion that she is unable to read or write or understand what she read. One of the ALJ's findings was that despite the low IQ scores within the record, Plaintiff's "practical adaptive functioning has been at or near the average range." (R: 527) As partial support for this finding, the ALJ pointed to Plaintiff's comment that she read "bad" statements in the record that she disagreed with. (R: 527) The ALJ relied in part on Plaintiff's concession regarding her ability to read – no matter the skill level – as a basis to find that her statements of impairment were not entirely credible. (R: 527) A 1994 Vocational Evaluation Report ("VER") acknowledges that Plaintiff's verbal skills give others the impression that her academic skills may be higher than her actual ability levels as reported by psychological testing. (R.: 153-54) Plaintiff reported to that examiner that "she has used that perception to her advantage in the past to cover up her limitations." (R.: 154)

---

[20] Administrative Law Judge Maurice W. Horne, who considered Plaintiff's application for disability benefits in 2004 and did not find any "severe" mental impairment, likewise questioned Plaintiff's credibility. (R: 19-20) (noting that Plaintiff's symptomatology and resulting limitations are "grossly exaggerated").

The ALJ also interpreted record evidence suggesting "hostility and evasiveness" and "manipulation of others" as undermining Plaintiff's credibility. (R: 527-28) One of the vocational examiners recognized that as options for employment and possible accomodations were discussed with Plaintiff, "it appeared that Ms. Bradley would recall and add other limitations that would prevent the earlier suggestions from being effective." (R: 154) As a result, the examiner identified Plaintiff's tendency to discount such suggestions as one of her limitations to obtaining gainful employment. (R: 157)

There is no indication that Plaintiff was not sincerely motivated to return to the work force, at least with respect to the relevant time period. As discussed, *supra*, Plaintiff was diligent in attempting to seek vocational rehabilitation, which tends to show that she genuinely wanted to return to the work force. One examiner stated, "Observations during the evaluation suggested that she [Plaintiff] was motivated . . . . Ms. Bradley was most cooperative with this evaluator." (R: 157-58)

A review of the record as a whole, particularly the hearing transcripts, tends to show that conduct perceived as attempted manipulation by Plaintiff should be considered alongside the possibility that it may actually be symptomatic of her mental impairments, *i.e.*, personality disorder / borderline intellect.[21] For all of these reasons, the Commissioner's decision on this issue is remanded for further consideration.

---

[21] This Court does not seek to reweigh Plaintiff's credibility but rather merely records the possible origin of the traits and characteristics deemed to render Plaintiff incredible.

## VI. CONCLUSION

Having conducted a *de novo* review of the issue specifically objected to by Plaintiff in the Magistrate Judge's "Memorandum & Recommendation" in this case, and a careful review of all other aspects of said recommendation, the Court disagrees with the findings of fact and conclusions of law specified in the Magistrate Judge's "Memorandum & Recommendation." The Court hereby <u>denies</u> the Commissioner's motion for summary judgment and Plaintiff's motion for summary judgment and <u>remands</u> this matter for further consideration pursuant to Sentence four of 42 U.S.C. §405(g) consistent with the findings of the instant Order.

Signed: April 15, 2009

Richard L. Voorhees
United States District Judge